> **CIVIL FALSE CLAIMS ACT COMPLAINT FILED**
> **UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3729, *et seq.***

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA
*ex rel.* DAVID W. STEBBINS,

      Plaintiff/Relator,

      v.

VASCULAR ACCESS CENTERS, LLC;
VASCULAR ACCESS CENTER OF
PITTSBURGH, LLC; PHILADELPHIA
VASCULAR INSTITUTE, LLC; MAIN
LINE VASCULAR INSTITUTE, LLC;
VASCULAR ACCESS CENTER OF
MAINLINE, LLC; PERIPHERAL
VASCULAR INSTIUTE OF
PHILADELPHIA, LLC; and JAMES F.
McGUCKIN,

      Defendants

## AMENDED COMPLAINT

Plaintiff-Relator, David W. Stebbins, by and through his undersigned counsel, hereby files

this Amended Complaint in the name of the United States of America against Defendants, Vascular

Access Centers, LLC, Vascular Access Center of Pittsburgh, LLC, Philadelphia Vascular Institute,

LLC, Main Line Vascular Institute, LLC, Vascular Access Center of Mainline, LLC, Peripheral

Vascular Institute of Philadelphia, LLC and James F. McGuckin.

## SUMMARY OF CLAIMS

1.    Plaintiff-Relator, David W. Stebbins ("Relator"), brings this qui tam action on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), against Defendants, Vascular Access Centers, LLC, Vascular Access Center of Pittsburgh, LLC, Philadelphia Vascular Institute, LLC, Main Line Vascular Institute, LLC, Vascular Access Center of Mainline, LLC, Peripheral Vascular Institute of Philadelphia, LLC and James F. McGuckin, to recover damages and civil penalties based on the false claims for payment Defendants made and presented, and caused to be made and presented, to the United States.

2.    Plaintiffs' claims arise from Defendants' submission of false claims for reimbursement from the Medicare and Medicaid programs for arteriograms allegedly performed at Defendants' facilities.  As Defendants knew, their claims were false and fraudulent because, for the reasons set forth below, the arteriograms performed at their facilities were not eligible for reimbursement.  In addition, Defendants submitted false claims for procedures that were not reasonable or medically necessary.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

4.    Venue lies in this District pursuant to 31 U.S.C. § 3732(a) because certain of the Defendants are found in, reside in or transact business in this District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

2

**PARTIES**

5.      Plaintiff is the United States, on behalf of its agencies, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS").

6.      Plaintiff-Relator, David W. Stebbins, is an adult individual residing in this District at 1245 Goodman Street, Pittsburgh, Pennsylvania 15218.

7.      From June 2006 until October 2018, Plaintiff-Relator was employed by Vascular Access Centers, L.P. ("VAC") as its Administrator Director.  Plaintiff-Relator's employment with VAC was involuntarily terminated.

8.      VAC is a Pennsylvania limited liability partnership maintaining its principal place of business at Cira Centre, 2929 Arch Street, Suite 620, Philadelphia, Pennsylvania 19104. Through its affiliates, VAC provides comprehensive dialysis access maintenance by and through various vascular access centers located throughout the United States, including in this District. VAC is the debtor in an involuntary Chapter 11 bankruptcy proceeding filed on November 12, 2019 by Philadelphia Vascular Institute, LLC and others.

9.      Plaintiff-Relator is the "original source" of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4).  Prior to the filing of this action, Plaintiff-Relator provided a written disclosure to the United States Government of the claims herein and the information on which such claims are based.

10.      Defendant Vascular Access Centers, LLC is a Pennsylvania limited liability company formed in February 2005.  Vascular Access Centers, LLC is, and throughout the time period relevant to the claims asserted herein was, a general partner of VAC.

11.     Defendant Vascular Access Center of Pittsburgh, LLC is a Pennsylvania limited liability company formed in December 2010 with a principal place of business located in this District at 51 Dutilh Road, Suite 100, Cranberry Township, Pennsylvania 16066.  On information and belief, VAC and/or defendant McGuckin have, and throughout the time period relevant to the claims asserted herein had, a controlling ownership interest in Vascular Access Center of Pittsburgh, LLC.

12.     Defendant Philadelphia Vascular Institute, LLC is a Pennsylvania professional limited liability company formed in August 2001 with a registered office located at 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101.  On information and belief, VAC and/or defendant McGuckin have, and throughout the time period relevant to the claims asserted herein had, a controlling ownership interest in Philadelphia Vascular Institute, LLC.

13.     Defendant Main Line Vascular Institute, LLC is a Pennsylvania limited liability company formed in July 2014 with a principal place of business located at 700 South Henderson Road, King of Prussia, Pennsylvania 19406.  On information and belief, VAC and/or defendant McGuckin have, and throughout the time period relevant to the claims asserted herein had, a controlling ownership interest in Main Line Vascular Institute, LLC.

14.     Defendant Vascular Access Center of Mainline, LLC is a Pennsylvania limited liability company formed in August 2011.  On information and belief, VAC and/or defendant McGuckin have, and throughout the time period relevant to the claims asserted herein had, a controlling ownership interest in Vascular Access Center of Mainline, LLC.

15.     Defendant Peripheral Vascular Institute of Philadelphia, LLC is a Pennsylvania limited liability company formed in August 2011 with a principal place of business located at 4220 Market Street, Philadelphia, Pennsylvania 19104.  On information and belief, VAC and/or

4

defendant McGuckin have, and throughout the time period relevant to the claims asserted herein had, a controlling ownership interest in Peripheral Vascular Institute of Philadelphia, LLC.

16. Defendants Vascular Access Center of Pittsburgh, LLC Philadelphia Vascular Institute, LLC, Main Line Vascular Institute, LLC, Vascular Access Center of Mainline, LLC and Peripheral Vascular Institute of Philadelphia, LLC are referred to collectively herein as the "VAC Pennsylvania Facilities."

17. Defendant James F. McGuckin, M.D. is the owner, founder and principal of VAC. McGuckin is, and throughout the time period relevant to the claims asserted herein was, a general partner of VAC.

18. McGuckin, through VAC and other corporations and entities, has established a network of facilities, including the VAC Pennsylvania Facilities described above, that provide vascular access services throughout the United States. McGuckin, through VAC, created these corporations by entering into partnerships with doctors in various locations in the United States to develop and manage medical practices specializing in vascular care. Under the terms of the partnerships, which are usually formalized through an operating agreement, McGuckin or VAC is the manager and majority member of the partnership. Subsidiaries and/or affiliates of VAC may be added to this case as additional defendants, based on facts to be developed through ongoing investigation and discovery.

19. Defendants' violations of the FCA arose through their submission of claims to, and receipt of funds from, the federal and state funded health care programs based on claims that Defendants knew, or reasonably should have known, were false claims. On information and belief, beginning at least as early as 2006, certain of the VAC Pennsylvania Facilities began to submit

false claims related to arteriograms performed by them, their affiliates, employees and agents, and have received payments from the United States Government on such false claims.

**FACTS COMMON TO ALL COUNTS**

**Statutory and Regulatory Background**

20.     The Medicare Program was established in 1965 through Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*., to provide a health insurance program for the aged and disabled.  Medicare is administered by HHS through CMS and is funded by taxpayer revenues.

21.     The overarching requirement of the Medicare program for reimbursement of services is that they must be reasonable and medically necessary.  Thus, the Medicare statute provides that "no payment may be made … for any expenses incurred for items or services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).

22.     Therefore, in order to obtain reimbursement from Medicare (and Medicaid), healthcare providers must submit Form CMS 1500, identifying the precise services provided and certifying as follows:

> SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services shown on this form were medically indicated and necessary for the health of this patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal direction.

> NOTICE:  This is to certify that the foregoing information is true, accurate and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under the applicable Federal and State laws.

23.     Section 1833(i)(1)(A) of the Social Security Act requires HHS to specify the surgical procedures that can be performed safely on an ambulatory basis in an ambulatory surgical

center ("ASC").  42 U.S.C. § 1395l(i)(1)(A); *see* 42 C.F.R. § 416(a)(2).  An ASC is defined as "any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission."  42 C.F.R. § 416.2.

24.     Part 416 of Title 42 of the Code of Federal Regulations sets forth regulations issued by HHS that set forth the conditions that ASCs must meet in order to participate in the Medicare program, the scope of covered services and the conditions for Medicare payment for facility services.  *See* 42 C.F.R. § 416.1(b) (definition of "ambulatory surgical center").  In order to participate in the Medicare program as an ASC, an entity must be a party to an agreement with CMS for participation as an ASC and the entity also must comply with the conditions set forth in subparts B and C of Part 416.  *Id*.  In addition, ASCs "must comply with State licensure requirements."  42 C.F.R. § 416.40.

25.     Regulations issued by HHS with respect to the scope of Medicare's coverage for services provided by ASCs include the following:

> (a)     **Covered surgical procedures.**  Effective for services furnished on or after January 1, 2008, covered surgical procedures are those procedures that meet the general standards described in paragraph (b) of this section (whether commonly furnished in an ASC or a physician's office) and are not excluded under paragraph (c) of this section.

> (b)     **General standards.**  Subject to the exclusions in paragraph (c) of this section, covered surgical procedures are surgical procedures specified by the Secretary and published in the Federal Register and/or via the Internet on the CMS Web site that are separately paid under the OPPS, that would not be expected to pose a significant safety risk to a Medicare beneficiary when performed in an ASC, and for which standard medical practice dictates that the beneficiary would not typically be expected to require active medical monitoring and care at midnight following the procedure.

    **(c)**    **General exclusions.** Notwithstanding paragraph (b) of this section, covered surgical procedures do not include those surgical procedures that –

    (1)   Generally result in extensive blood loss;

    (2)   Require major or prolonged invasion of body cavities;

    (3)   Directly involve major blood vessels;

    (4)   Are generally emergent or life-threatening in nature;

    (5)   Commonly require systemic thrombolytic therapy;

    (6)   Are designated as requiring inpatient care under § 419.22(n) of this subchapter;

    (7)   Can only be reported using a CPT unlisted surgical procedure code; or

    (8)   Are otherwise excluded under § 411.15 of this subchapter.

42 C.F.R. § 416.166.

26.    All of the arteriograms performed by Defendants directly involved major blood vessels.

27.    The Medicaid Program was established through Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, to provide a health insurance program for low-income individuals and families that meet eligibility requirements determined by federal and state law. Medicaid is administered by HHS and the various states and is funded by both state and federal funds. Medicaid pays for items and services pursuant to plans developed by the states and approved by HHS. States pay health care providers according to established rates, and the federal government reimburses the states a statutorily established share of "the total amount expended … as medical assistance under the States' plan." *See* 42 U.S.C. §§ 1396b(a)(1).

28.     The Commonwealth of Pennsylvania administers Medicaid through the Office of Medical Assistance Programs of the Commonwealth's Department of Human Services ("DHS"). In order to be reimbursed by Medicaid, a provider of services in the Commonwealth of Pennsylvania must enroll in the Pennsylvania Medicaid Program.  *See* 55 Pa. Code § 1101.43.  To participate in Pennsylvania's Medicaid program, providers must satisfy various requirements, including complying with applicable standards of practice.  In particular: "[i]n addition to licensing standards, every practitioner providing medical care to [Medical Assistance] recipients is required to adhere to the basic standards of practice listed in this subsection.  Payment will not be made with the Department's review of a practitioner's medical records reveals instances where these standards have not been met."  55 Pa. Code § 1101.51(d).

29.     In administering the Pennsylvania Medicaid program, DHS only pays for "medically necessary compensable services and items" in accordance with DHS Medicaid regulations.  55 Pa. Code § 1101.61.  In addition, DHS "pays for compensable services or items rendered if, among other requirements, the service or item is "[w]ithin the practitioner's scope of practice."  55 Pa. Code § 1101.66.  In addition, as is discussed above, in order to obtain reimbursement from the Medicaid program, healthcare providers must submit Form CMS 1500, identifying the precise services provided and certifying that those services were medically indicated and necessary for the health of the patient.

30.     Chapter 1126 of DHS's regulations sets forth regulations that specifically apply to Medicaid's reimbursement for services provided by ASCs.  55 Pa. Code §§ 1126.1, *et seq*.  In its regulations, DHS lists various "noncompensable services and items," including (i) "[a] service not designated by the Department as appropriate to be performed by an ASC," (ii) "[a] service that does not conform to the requirements of this chapter," and (iii) "[a] service provided by an

9

ambulatory surgical center that does not meet the Federal Medicare requirements at 42 C.F.R. 416 (relating to ambulatory surgical services)."  55 Pa. Code § 1126.54(a)(1), (a)(2) and (a)(6).

31.     In addition to the DHS's Medicaid-related regulations, the Pennsylvania Department of Health ("DOH") has issued regulations under the Health Care Facilities Act, 35 P.S. §§ 448.101, *et seq.*, that govern ambulatory surgical facilities ("ASFs") and the conditions under which ASFs may perform surgeries.  The purpose of those regulations "is to protect and promote the public health and welfare through the establishment and enforcement of regulations setting minimum standards in the construction, maintenance and operation of ASFs."  28 Pa. Code § 551.1(c).  The standards set forth by the regulations "are intended to assure safe, adequate and efficient facilities and services, and to promote the health, safety and adequate care of the patients of the facilities."  *Id*.

32.     Pennsylvania DOH regulations provide that "[s]urgery shall be performed only in an acute care hospital or in a Class A, Class B or Class C ambulatory surgical facility."  28 Pa. Code § 51.21; *see also* 28 Pa. Code § 551.2(a) ("Only those facilities which are licensed under this subpart shall provide ambulatory surgery in this Commonwealth, except as provided in Class A facilities."); 28 Pa. Code § 551.3 (broadly defining "surgery" as "[t]he branch of medicine that diagnoses and treats diseases, disorders, malformations and injuries wholly or partially by operative procedures").  During the period of time relevant to the claims asserted herein, Defendants' facilities were not qualified facilities at which surgeries could be performed.

33.     In addition, the Pennsylvania DOH regulations applicable to ambulatory surgery provide that "[s]urgical procedures may not be of a type that . . . [d]irectly involve major blood vessels."  28 Pa. Code § 551.21(d)(3).  All of the arteriograms performed by Defendants, and for which Defendants submitted false claims, directly involved major blood vessels.

34.     Further, the Pennsylvania DOH regulations prohibit procedures that involve the use of moderate sedation being performed in any facility other than a Class B or C ASF or acute care hospital.  *See* 28 Pa. Code § 551.3 (defining classification levels of ASFs).  All of the arteriograms performed at Defendants' facilities involved the use of moderate sedation and Defendants' facilities at which arteriograms were performed, and with respect to which Defendants submitted false claims, were not Class B or C ASFs or acute care hospitals.

35.     In addition, defendant McGuckin, on behalf of Philadelphia Vascular Institute, LLC, Vascular Access Center of Pittsburgh, LLC and other VAC-affiliated entities to be identified through discovery, regularly and routinely performed procedures that were not medically necessary, but for which reimbursement from the Medicare and Medicaid programs was requested and obtained.

36.     The standard of care for hemodialysis patients with stenosed arteriovenous fistulas is balloon angioplasty.  When sub-optimal angioplasty results occur, as defined by residual stenosis of greater than thirty percent, or dissection inhibiting flow, stent placement is warranted.  Typically, stenting is needed less than fifty percent of the time; however, McGuckin places stents in all of his patients.

37.     In addition, McGuckin evaluates the blood vessels utilizing intravascular ultrasound ("IVUS").  The standard of care involves intravascular contrast agent and obtaining x-rays of the blood vessels.  Although IVUS is rarely indicated, McGuckin uses it on all of his patients.

38.     In overusing stents and IVUS in his practice, McGuckin intended to maximize reimbursement from the Medicare and Medicaid programs and he directed the submission of false claims by Philadelphia Vascular Institute, LLC, Vascular Access Center of Pittsburgh, LLC and

11

other VAC-affiliated entities to the Medicare and Medicaid programs requesting payment for medically unnecessary procedures.

39. McGuckin has instructed and/or encouraged others at VAC-affiliated entities to engage in the overuse of stents and IVUS as described above, which has resulted in further submissions of false claims by VAC-affiliated entities.

40. The FCA imposes liability for treble damages and civil penalties on anyone who "knowingly presents, or causes to be presented [to the United States] a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The definition of "knowingly" includes acting in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information and does not require proof of specific intent to defraud. 31 U.S.C. § 3929(b)(1).

**Defendants' Submission of False Claims**

41. The procedures that were the subject of Defendants' false claims were arteriograms. Nearly all arteriograms involve puncturing the femoral artery and inserting a small plastic device (approximately three millimeters in diameter). Through this device the physician inserts smaller plastic tubes into the area of interest, which usually is another artery in the leg. The physician then injects contrast (x-ray dye) to demonstrate pathology – which usually is in the form of a blockage in the artery. Once demonstrated, an angioplasty is performed to open the blockage. The procedure is similar to a heart catheterization, but is performed on the legs. In most geographical areas, these procedures are performed in hospitals. However, some physicians, such as defendant McGuckin and other physicians employed by VAC and the VAC Pennsylvania Facilities, perform the procedures outside hospitals and in out-patient facilities. Defendants did so in Pennsylvania (and possibly other states) without seeking the proper authorization from the Pennsylvania DOH.

As is set forth above, the Pennsylvania DOH specifically prohibits procedures from being performed in an ambulatory surgical center when the procedures involve major arteries.

42.     Defendants have presented false and fraudulent claims for reimbursement to the United States, through claims submitted to both the Medicare and Medicaid programs, in connection with arteriograms performed at Defendants' facilities.  On information and belief, arteriograms for which Defendants submitted false claims were performed at the VAC Pennsylvania Facilities, among other facilities owned and controlled by VAC and/or McGuckin.

43.     Defendants have received substantial payments from the United States in response to their false and fraudulent claims.

44.     Defendants' conduct was material.  Defendants' conduct had a natural tendency to influence or was capable of influencing the Federal Government to pay Defendants' Medicaid claims.  In particular, to the extent that HHS, CMS and DHS had been aware of Defendants' failure to comply with applicable regulations, such failures would have influenced the decisions to pay for those claims because such claims were not reimbursable as a matter of law.

45.     Defendants submitted claims for Medicare payments for services that were not rendered in compliance with the requirements of applicable regulations pertaining to ASCs' services.  The ways in which Defendants' claims for payment by the Medicare program failed to comply with applicable requirements included:

a.     Defendants submitted claims for arteriograms that were excluded from "covered surgical procedures" because they directly involved major blood vessels (*see* Paragraphs 23-26 above and 42 C.F.R. § 416.166);

b.     Defendants submitted claims for arteriograms, which were surgical procedures performed in violation of Pennsylvania DOH regulations providing that

surgeries may be performed only in acute care hospitals or in a Class A, Class B or Class C ASFs (*see* Paragraph 32 above and 28 Pa. Code §§ 51.21, 551.2(a));

c.     Defendants submitted claims for arteriograms that were performed in violation of Pennsylvania DOH regulations that provide that surgical procedures provided by ASFs may not be of a type that directly involve major blood vessels (*see* Paragraph 33 above and 28 Pa. Code § 551.21(d)(3));

d.     Defendants submitted claims for arteriograms that were performed in violation of Pennsylvania DOH regulations that prohibit procedures that involve the use of moderate sedation being performed in any facility other than a Class B or C ASF or acute care hospital (*see* Paragraph 34 above and 28 Pa. Code § 551.3);

e.     Defendants submitted claims for services that were not medically reasonable and necessary, in violation of 42 U.S.C. § 1395y(a)(1)(A).

46.     Defendants submitted claims for Medicaid payments for services that were not rendered in compliance with the requirements of applicable regulations pertaining to ASCs' services. The ways in which Defendants' claims for payment by the Medicaid program failed to comply with applicable requirements included:

a.     In submitting claims for arteriograms in violation of applicable regulations, Defendants failed to adhere to the basic standards of practice applicable to participants in Pennsylvania's Medicaid program (*see* Paragraph 28 above and 55 Pa. Code § 1101.51(d));

b.     Defendants submitted claims for arteriograms that were not "medically necessary compensable services and items" in accordance with DHS's Medicaid regulations (*see* Paragraph 29 above and 55 Pa. Code § 1101.61);

14

c.      Defendants submitted claims for arteriograms that were not "[w]ithin the practitioner's scope of practice" (*see* Paragraph 29 above and 55 Pa. Code § 1101.66);

d.      Defendants submitted claims for arteriograms that were "noncompensable services and items" within DHS's regulations because they constituted services "not designated by the Department as appropriate to be performed by an ASC" (*see* Paragraph 30 above and 55 Pa. Code § 1126.54(a)(1));

e.      Defendants submitted claims for arteriograms that were "noncompensable services and items" within DHS's regulations because they constituted services that did not conform to the requirements of the regulations (*see* Paragraph 30 above and 55 Pa. Code § 1126.54(a)(2));

f.      Defendants submitted claims for arteriograms that were "noncompensable services and items" within DHS's regulations because they were services provided by an ASC that did not meet the federal Medicare requirements at 42 C.F.R § 416 relating to ambulatory surgical services (*see* Paragraph 30 above and 55 Pa. Code § 1126.54(a)(6));

g.      Defendants submitted claims for arteriograms that were excluded from "covered surgical procedures" because they directly involved major blood vessels (*see* Paragraphs 23-26 and 33 above, 42 C.F.R. § 416.166 and 55 Pa. Code § 1126.54(a)(6));

h.      Defendants submitted claims for arteriograms, which were surgical procedures performed in violation of Pennsylvania DOH regulations providing that

15

surgeries may be performed only in acute care hospitals or in a Class A, Class B or Class C ASFs (*see* Paragraph 32 above and 28 Pa. Code §§ 51.21, 551.2(a));

i.     Defendants submitted claims for arteriograms that were performed in violation of Pennsylvania DOH regulations that provide that surgical procedures provided by ASFs may not be of a type that directly involve major blood vessels (*see* Paragraph 33 above and 28 Pa. Code § 551.21(d)(3));

j.     Defendants submitted claims for arteriograms that were performed in violation of Pennsylvania DOH regulations that prohibit procedures that involve the use of moderate sedation being performed in any facility other than a Class B or C ASF or acute care hospital (*see* Paragraph 34 above and 28 Pa. Code §§ 51.21, 551.3); and

k.     Defendants submitted claims for services that were not medically necessary compensable services and items, in violation of 55 Pa. Code § 1101.61 and other applicable provisions of law.

47.     Defendants knew, or should have known, that the United States would not pay for such services under the Medicare and Medicaid programs if it had been aware of the fact that the procedures for which the claims were submitted were in violation of law.

48.     Through the submission of their false claims, Defendants expressly certified in Forms CMS 1500 that the procedures and services for which the claims were submitted were reasonable and medically necessary and otherwise eligible for reimbursement.

49.     Through the submission of their false claims, Defendants impliedly certified that the arteriograms for which claims were made were eligible for reimbursement. Defendants' implied certifications were false and fraudulent.

16

50. Defendants' claims also were false and fraudulent because they omitted material information about their multiple failures to comply with applicable federal and state regulations. Had such information been disclosed to HHS, CMS and DHS by Defendants, Defendants' claims would not have been paid.

51. Defendants' presentment of false and fraudulent claims for payment or approval constituted violations of the FCA, 31 U.S.C. § 3729(a)(1)(A).

52. Defendants' knowing use of false records or statements material to their false and fraudulent claims constituted violations of the FCA, 31 U.S.C. § 3729(a)(1)(B).

53. The United States of America has sustained damages, in an as yet undetermined amount, as a direct and proximate result of Defendants' violations of the FCA.

**COUNT ONE**
**Violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)**
**Knowingly Presenting False or Fraudulent Claims – Against All Defendants**

54. Plaintiff-Relator incorporates Paragraphs 1 through 53 hereof as if set forth in their entirety.

55. Through their wrongful conduct described above, Defendants knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval.

56. Defendants knew that their claims for payment were false or fraudulent, they were deliberately ignorant that their claims for payment were false or fraudulent, or they acted in reckless disregard of the fact that their claims were false or fraudulent.

57. Plaintiff, the United States, was unaware of the false and fraudulent nature of the claims and Defendants' conduct, and in reliance on the truth and accuracy of the claims made

17

payments to Defendants, which resulted in the United States being damaged in an amount to be established at trial.

## COUNT TWO
### Violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)
### Knowingly Making, Using or Causing to be Made or
### <u>Used, a False Record or Statement – Against All Defendants</u>

58.     Plaintiff-Relator incorporates Paragraphs 1 through 57 hereof as if set forth in their entirety.

59.     Through their wrongful conduct described above, Defendants knowingly made, used or caused to be made or used, false records and statements material to their false and fraudulent claims allowed.

60.     Plaintiff, the United States, was unaware of the false and fraudulent nature of the claims and Defendants' conduct, and in reliance on the truth and accuracy of the claims made payments to Defendants, which resulted in the United States being damaged in an amount to be established at trial.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff-Relator, on behalf of the United States of America, demands judgment against Defendants as follows:

(1)     Treble the amount of damages sustained by the United States, in an amount to be established at trial equal to the amount of false claims submitted by Defendants;

(2)     Assessment of civil penalties in the amount of $10,000 for each false or fraudulent claim that Defendants made or caused to be made to the United States Government; and

(3)     All other necessary and proper relief, including the costs of this action.

Plaintiff-Relator further demands on his behalf:

18

(1)     In the event that the United States of America proceeds with this action or otherwise settles these claims, the Court award to Plaintiff-Relator an amount of the proceeds of this action or settlement of these claims of not less than fifteen percent and as much as twenty-five percent, pursuant to 31 U.S.C. § 3730(d), together with an amount of reasonable expenses incurred by Plaintiff-Relator, plus reasonable attorneys' fees and all costs and expenses incurred by Plaintiff-Relator in bringing this action;

(2)     In the event that the United States of America does not proceed with this action, the Court award to Plaintiff-Relator an amount of the proceeds of this action or settlement of these claims of not less than twenty-five percent and as much as thirty percent, pursuant to 31 U.S.C. § 3730(d), together with an amount of reasonable expenses incurred by Plaintiff-Relator, plus reasonable attorneys' fees and all costs and expenses incurred by Plaintiff- Relator in bringing this action.

### DEMAND FOR JURY TRIAL

Pursuant to Fed.R.Civ.P. 38, Plaintiff-Relator demands a trial by jury.

/s/ Michael J. Betts
Michael J. Betts
Pa. I.D. No. 33378
Michael J. Betts LLC
235 Alpha Drive, Suite 301B
Pittsburgh, PA  15238
(412) 935-7073
Email:  *mbetts@bettsllc.com*

Counsel for Plaintiff-Relator,
David W. Stebbins

19